Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| TATIANA VALLESCORBO CUEVAS <br><br> Apelante <br><br> v. <br><br> IVÁN E. RIVERA LABRADOR <br><br> Apelado | KLAN202300199 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan <br><br> Sobre:  Custodia <br><br> Caso Núm. KCU2019-0066 (701) |

Panel integrado por su presidente, el juez Rodríguez Casillas, la jueza Mateu Meléndez y el juez Marrero Guerrero.

Rodríguez Casillas, juez ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de diciembre de 2023.

Comparece ante nos la señora Tatiana Vallescorbo Cuevas (Vallescorbo Cuevas o apelante) para que revisemos la *Sentencia* dictada y notificada el 29 de diciembre de 2022, por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI), en la que sostuvo los hallazgos y las recomendaciones del *Informe Social Forense* emitido por la trabajadora social, Elizabeth Litsky Collazo. Por lo que, entre otros asuntos, ordenó continuar con la custodia compartida del menor N.E.R.V.

El 13 de enero de 2023, la apelante solicitó reconsideración y el 6 de febrero de 2023 el TPI la declaró *No Ha Lugar*.[1]

Examinados los escritos de las partes y con el beneficio de la transcripción de la prueba oral, resolvemos **confirmar** el dictamen apelado. Veamos los fundamentos.

---

[1] Notificada el mismo día.

**-I-**

El **22 de febrero de 2019** la señora Vallescorbo Cuevas incoó una demanda contra el señor Iván Enrique Rivera Labrador (Rivera Labrador o apelado) solicitando la custodia monoparental de su hijo N.E.R.V. (NERV o menor),[2] producto de una relación que culminó en verano de 2018, por lo que acordaron compartir la custodia del menor. Sin embargo, ante la existencia de un ambiente de alta conflictividad entre ambos progenitores, la señora Vallescorbo Cuevas solicitó la concesión de una custodia monoparental.

Ante tal solicitud, el TPI ordenó a la Unidad Social la realización de un informe social. Por lo cual, el **9 de junio de 2019** la trabajadora social Elizabeth Litsky Collazo (TS Litsky Collazo), rindió un *Informe Social Forense* (Informe Social I) recomendando la custodia compartida.[3] Recibido el Informe Social I, se les informó a las partes el trámite a seguir de no estar conformes.[4] Por ello, la apelante decidió impugnar el mismo.[5]

Luego de varios incidentes, el TPI entendió que era necesario reevaluar el caso,[6] por lo cual, el **12 de mayo de 2021** ordenó a la Unidad Social la reevaluación. En lo pertinente, expresó:

> *Se refiere el asunto a la Unidad Social para revaluación debido a que han transcurrido casi dos años desde que se presentó el Informe Social original sin que se haya determinado si el Tribunal acoge las recomendaciones. Además, porque con posterioridad a la presentación del Informe han ocurrido incidentes entre las partes que están íntimamente relacionados con los requisitos que el Tribunal debe evaluar al momento de adjudicar los casos de Custodia, a tenor con la Ley 223 de 2011. A estos efectos, se ordena a la unidad Social evaluar los eventos relacionados con las alegaciones sobre eventos de Ley 54; los acuerdos alcanzados por las partes en ocasión de un caso de Ley 54; las alegaciones sobre agresión sexual al menor; y, la intención de los profesionales de la salud que han evaluado y/o tratado en este periodo a este núcleo familiar y sus componentes. [...].[7]*

---

[2] Anejo I de la Apelante, págs. 1 – 5.
[3] Anejo CXXV de la Apelante, págs. 494 – 507.
[4] Anejo VIII de la Apelante, págs. 35 – 36.
[5] Anejo IX de la Apelante, págs. 43 – 45.
[6] Anejo LXX de la Apelante, págs. 254 – 257.; *Véase*, además, Anejo LXXI de la Apelante, págs. 258 – 259.
[7] *Id.*, en la pág. 255.

En cumplimiento con lo ordenado, el **16 de septiembre de 2021** la TS Litsky Collazo sometió un *Informe Social Forense* (Informe Social II).[8] Reiteró su recomendación de que ambos progenitores ostentaran la custodia compartida de NERV.

*1. Que la Custodia del menor continúe Compartida entre las partes de la siguiente forma;*
 *- Semanas alternas de lunes a lunes, entregando y recogiendo el menor en su colegio y cuando no haya clases en la caseta del guardia de la Urbanización Monteclaro, donde reside la madre y los abuelos maternos.*
 *- El señor Rivera podrá hacer arreglos de cuido con el Sr. Mario Rivera, abuelo paterno, y el Sr. Xavier Rivera cuando esté de turno y tenga que salir a atender un caso. De éstos no poder ayudarlo, le madre será la opción.*
 *- Cada padre se comunicará con el menor miércoles y sábados entre 5:00 y 6:00 p.m. de la semana que no lo tenga bajo su cuidado. De no responder la llamada, el padre que lo tiene bajo su cuidado, se encargará de devolver le llamada.*
 *- Durante el periodo navideño se alternarán entre las partes las siguientes fechas cada año:*
 *- Del 24 de diciembre a las 3:00 p.m. al 31 de diciembre a las 3:00 p.m.*
 *- Del 31 de diciembre a las 3:00 p.m. al 7 de enero a las 3:00 p.m.*
 *- En el 2021-2022 el menor estará con el padre del 24 al 31 de diciembre y del 31 de diciembre al 7 de enero con la madre.*
 *- El fin de semana que se celebra el Día de los Padres, el menor permanecerá con el padre de viernes a domingo, independientemente a quien le corresponda. De igual forma será el fin de semana que se celebra el Día de las Madres.*
*2. Que se le prohíba a las partes, sus familiares y a cualquier otra persona relacionada a ellos hacer comentarios sobre las partes en presencia del menor.*
*3. Que se le prohíba al Sr. Imanol Caballero, compañero de la madre, realizar comentarios alusivos al caso de las partes y sobre el Sr. Iván E. Rivera Labrador y sus familiares, en las redes sociales y en los medios de comunicación para los que escribe. De igual forma, el Sr. Iván E. Rivera Labrador no deberá hacer comentarios sobre el señor Caballero y sus familiares en las redes sociales.*
*4. Las partes se notificarán todos los asuntos relacionados al menor. Cada padre será responsable da las citas médicas, terapias y otros asuntos cuando lo tenga bajo su custodia.*
*5. Las partes continuaran participando del proceso de Coordinación de Parentabilidad con la Dra. María del Mar Torres Suria. Estos cumplirán con las condiciones y reglas establecidas por la doctora. Que la Dra. Torres someta un Informe al Tribunal del Progreso del proceso de parentabilidad.*
*8. El menor continuará participando de terapia psicológica con la Psicóloga que recomiende la Dra. Francés Seda, Psicóloga.[9]*

---

[8] Anejo CXXVII de la Apelante, págs. 534 – 560.
[9] *Id.*, en las págs. 559 – 560.

En desacuerdo, el **13 de octubre de 2021** la señora Vallescorbo Cuevas anunció su intención de impugnar el referido informe.[10] En resumen, señaló las siguientes razones para impugnar el Informe Social II:

- *No refleja haber puesto al menor como la estrella polar del caso que nos ocupa;*
- *Carece de información esencial e indispensable para la adjudicación de un caso de custodia;*
- *Da visos de parcialidad al basarse en las recomendaciones de una profesional de la salud que tuvo y ocultó a una de las partes el conflicto de interés que existía y que incidía directamente con su recomendación;*
- *No hace referencia al efecto que tuvo sobre el menor en el ámbito escolar el ejercicio de la custodia compartida provisional por los pasados años que, de haberse considerado utilizando los estándares de la profesión del trabajo social, no llevarían a concluir de la misma forma;*
- *Tiene visos de parcialidad, por omitirse toda la información que resultaba adversa a una de las partes;*
- *Omite información sumamente importante certificada por la escuela del menor sobre cuál ha sido el rendimiento escolar desde que la custodia ha sido provisionalmente compartida;*
- *Se minimizan los incidentes de violencia doméstica y de maltrato de menores al dejar de incluir los relatos sobre todo incidentes graves ocurridos en presencia del menor;*
- *Erróneamente concluye que ambos padres están en igualdad de condiciones para custodiar al menor durante los periodos de turno que resultan tan amplias que no atienden adecuadamente las necesidades del menor;*
- *Ignora la prueba pertinente al atender, discutir y evaluar todos los elementos reconocidos por nuestro Tribunal Supremo al momento de adjudicar una custodia compartida, aunque los discuta uno a uno.[11]*

Luego de varios trámites procesales, se celebró el Juicio en su fondo en los días del **5 al 9 de diciembre de 2022**.[12] Ambas partes comparecieron personalmente, y testificaron en la vista.[13] Evaluados los testimonios ofrecidos en el Juicio y el expediente del caso, el TPI emitió una *Sentencia* el **29 de diciembre de 2022**,[14] con las siguientes determinaciones de hechos:

> *1. Las partes en el presente asunto son los padres del menor Nicolás Enrique Rivera Vallescorbo, nacido el 8 de mayo de 2013.*
> *2. Las partes sostuvieron una relación consensual que finalizó en el año 2018.*

---

[10] Anejo LXXXVII de la Apelante, págs. 327 – 335.
[11] *Id.*, en las págs. 333 – 334.
[12] *Transcripción de Vista de Impugnación de Informe Social* (TPO).
[13] Además de las partes, comparecieron en calidad de testigo: la TS Litsky Collazo (Perito del tribunal); el Sr. Imanol Caballero Valentín (esposo de la señora Vallescorbo Cuevas); la Dra. Iris M. Rosales Concepción (Perito de la señora Vallescorbo Cuevas); y, el Dr. Emil Alicea Rodríguez (perito del señor Rivera Labrador).
[14] Anejo CXX de la Apelante, págs. 442 – 460.

*3. Cuando finalizaron su relación las partes acordaron, extrajudicialmente, compartir la custodia de su hijo Nicolás.*
*4. Desde e1 2018 al presente las partes han compartido la custodia del menor.*
*5. La Custodia Compartida se interrumpió por un periodo durante los meses de junio a agosto de 2020, cuando se suspendieron las relaciones entre el menor y el señor Rivera por la expedición de una Orden de Protección Ex Parte en contra del padre.*
*6. El plan de Custodia Compartida se reanudo el 30 de agosto de 2020.*
*7. La Trabajadora Social Litsky Collazo tiene 33 años y 8 meses de experiencia como Trabajadora Social, todos ellos en la Unidad de Trabajo Social del Tribunal de San Juan.*
*8. La Trabajadora Social Litsky Collazo ha rendido dos Informes en el presente asunto, por lo que conoce a este núcleo familiar desde el 2019.*
*9. En la sección II de su Informe, sobre Motivo del Referido, la Trabajadora Social Litsky Collazo indicó lo siguiente:*

> *La Sra. Tatiana Vallescorbo Cuevas, madre del menor, interesa la custodia monoparental. Considera que el bienestar emocional y físico al igual que la seguridad del menor están bajo su custodia. El Sr. Iván Rivera Labrador, padre del menor, se opone a la solicitud de ésta. Considera que no hay razones para cambiar el arreglo de custodia compartida existente.*

*10. En la sección sobre Motivo del Referido la Trabajadora Social incluyó las posturas de cada parte sobre el asunto en controversia que, en este caso, es la Custodia del menor.*
*11. La Orden de Referido del Tribunal, fechada 12 de mayo de 2021, es una Orden de Reevaluación de Custodia y Custodia Compartida y responde, precisamente, al motivo indicado por la Trabajadora Social en su Informe; a saber, la demandante interesa la custodia monoparental y el demandando la custodia compartida.*
*12. Se ordenó la reevaluación del caso porque habían transcurrido casi dos años desde que se rindiera el Informe original y porque se alegaba habían ocurrido eventos que incidían sobre los criterios que dispone la Ley 223 de 2011.*
*13. Las instrucciones impartidas en la Resolución y Orden de 12 de mayo de 2021 eran sobre asuntos a ser evaluados como parte del Estudio Social sobre Custodia, pero no constituían el motivo del referido.*
*14. El 23 de mayo de 2020 se expidió una Orden de Protección Ex Parte al amparo de la Ley 54, a favor de la señora Vallescorbo Cuevas y en contra del señor Rivera Labrador, en el caso OPA-2020-003545.*
*15. La vista en el referido caso OPA-2020-003545, fue pautada para el 22 de julio de 2020.*
*16. El 22 de julio de 2020, previo al comienzo de la vista, las partes llegaron a una Estipulación, bajo juramento, en la que acordaron lo siguiente:*
   a. *Las partes no tendrían ninguna comunicación ni contacto, excepto bajo las condiciones específicamente establecidas en el referido acuerdo.*
   b. *La única comunicación que tendrían las partes sería la relacionada al recogido y entrega del menor.*
   c. *De reestablecerse las relaciones paternofiliales en el presente caso de Custodia, el recogido y entrega del menor sería en la entrada-caseta de la Urbanización Monteclaro en Bayamón.*
   d. *En caso de que el señor Rivera Labrador no pudiera llegar a tiempo debería enviar mensaje a la señora Vallescorbo Cuevas, informándole en un periodo de*

*dos horas o menos antes del recogido o entrega. En ese caso, la señora Vallescorbo Cuevas llevaría al menor a la casa de su hermana para que el señor Rivera Labrador pudiera recogerlo.*

e. *Ninguna de las partes podría enviar mensaje a través de terceros.*

f. *El acuerdo estaría vigente por un año, o hasta que un foro con jurisdicción dispusiera otra cosa.*

g. *El acuerdo se haría formar parte del presente litigio.*

h. *Si el señor Rivera Labrador tuviese que ir a la legislatura, notificaría a la señora Vallescorbo Cuevas con antelación por mensaje de texto.*

**17.** *Con posterioridad a alcanzar la referida Estipulación no hubo querellas adicionales entre las partes por violencia doméstica.*

**18.** *Cuando la Trabajadora Social Litsky Collazo condujo el estudio social no había un caso sobre Violencia Domestica pendiente y la Perito entendió que las partes habían alcanzado un acuerdo sobre el asunto antes de que las alegaciones de la señora Vallescorbo Cuevas fuesen adjudicadas por un tribunal con competencia.*

**19.** *La Trabajadora Social Litsky Collazo identificó el acuerdo entre las partes como un "Acuerdo de Comunicación", porque en ese documento se establecía la forma en la que las partes se comunicarían, aunque fuese de manera limitada, para coordinar la entrega y recogido del menor.*

**20.** *El referido acuerdo es esencialmente un acuerdo de comunicación porque regula la forma en la que se daría la comunicación entre las partes.*

**21.** *Como parte del Protocolo de Evaluación la Trabajadora Social Litsky Collazo entrevistó a la señora Vallescorbo Cuevas en las siguientes ocasiones:*

a. *10 de junio de 2021 - por videoconferencia*

b. *5 de agosto de 2021- por videoconferencia*

c. *24 de agosto de 2021-de manera presencial*

**22.** *Durante alguna de esas entrevistas la señora Vallescorbo Cuevas entregó a la Trabajadora Social varios documentos sobre asuntos que ella entendía debían ser considerados por ser pertinentes a la controversia entre las partes.*

**23.** *La Trabajadora Social no incluyó los documentos que le fueron entregados por la señora Vallescorbo Cuevas en el listado de documentos incluidos en la sección IV, inciso C del Informe Social, sobre Revisión de Documentos.*

**24.** *Los documentos entregados por la señora Vallescorbo Cuevas a la Trabajadora Social Litsky Collazo no fueron sometidos en evidencia durante el juicio en su fondo, <u>lo que nos impide conocer su contenido y evaluar si los mismos pudieron afectar los hallazgos y las recomendaciones de la Trabajadora Social Litsky Collazo</u>.*

**25.** *Las alegaciones de las partes relacionadas al funcionamiento escolar de Nicolás fueron evaluadas por la Trabajadora Social Litsky Collazo mediante entrevista a la Directora de la Escuela Josefita Monserrate de Selles, donde estudia el menor.*

**26.** *La Trabajadora Social Litsky Collazo se comunicó con la escuela del menor y fue la institución educativa la que determinó cual sería el funcionario que pondrían a disposición de la Trabajadora Social Litsky Collazo para ser entrevistado.*

**27.** *Durante la entrevista con la Directora de la escuela del menor no surgió información de que el menor confrontara problemas de tardanzas ni de falta de pagos.*

**28.** *De las entrevistas realizadas por la Trabajadora Social Litsky Collazo al menor no surgieron indicios de que el menor percibiera la situación de hostilidad y confrontación entre las partes, aunque sí sabe que no se hablan y desconoce la razón para ello.*

29. *Del Informe Social se desprende que el menor sí percibe que el señor Rivera Labrador y el señor Caballero Valentín no se agradan.*

30. *La Trabajadora Social Litsky Collazo no visitó la Urbanización Monteclaro para corroborar las alegaciones de la señora Vallescorbo Cuevas sobre uno de los eventos que dio pie a que ella solicitara una Orden de Protección Ex Parte.*

31. *Del estudio social realizado, la Trabajadora Social Litsky Collazo confirmó que el menor fue dejado solo en el vehículo por el señor Rivera Labrador en dos ocasiones.*

32. *Ante el antes mencionado hallazgo, la Trabajadora Social optó por orientar al padre de que no podía dejar solo al menor; orientación a la que el señor Rivera Labrador se mostró receptivo.*

33. *A pesar de tener la discreción de referir al Rivera Labrador a alguna agencia ante sus hallazgos, la Trabajadora Social no lo consideró necesario porque entendió que con la orientación provista era suficiente para que el hecho no volviera a ocurrir, considerando la receptividad del demandado a las directrices impartidas.*

34. *En nuestra Resolución de 27 de septiembre de 2021, establecimos que se prohibía a las partes dejar solo, sin supervisión, al menor en cualquier momento o circunstancia, por breve que pudiera parecer.*

35. *La Trabajadora Social Litsky Collazo fue notificada de la Resolución y Orden de 12 de mayo de 2021, tomó conocimiento de las instrucciones impartidas respecto a los asuntos que debía considerar en su evaluación.*

36. *La Trabajadora Social Litsky Collazo cumplió la encomienda de evaluar las alegaciones de Ley 54; los acuerdos alcanzados por las partes en ocasión del caso de Ley 54; las alegaciones sobre agresión sexual al menor; y, la intervención de los profesionales de la salud que habían evaluado y/o tratado al menor y al núcleo familiar.*

37. *Con respecto a las alegaciones de Ley 54, la Trabajadora Social Litsky Collazo entendió que, habiendo las partes alcanzado un acuerdo sin que un foro con competencia adjudicara las alegaciones, el asunto había quedado resuelto entre ellos.*

38. *La señora Vallescorbo Cuevas no denunció incidentes o eventos adicionales a los ocurridos con anterioridad al acuerdo alcanzado por las partes.*

39. *Con respecto a los acuerdos alcanzados por las partes en ocasión del caso de Ley 54, la Trabajadora Social Litsky Collazo tomó conocimiento de estos y los detalló en su Informe Social.*

40. *Con respecto a las alegaciones sobre agresión sexual al menor y la intervención de los profesionales de la salud que habían evaluado y/o tratado al menor y al núcleo familiar, la Trabajadora Social Litsky Collazo, la Trabajadora Social obtuvo la información al respecto de parte de la Dra. Frances Seda quien en ese momento era la psicóloga del menor.*

41. *La Trabajadora Social Litsky Collazo no evaluó el Informe de la Dra. Judith Mercado ni entrevistó a la profesional, sino que obtuvo el insumo de su intervención de parte de la Dra. Frances Seda.*

42. *Al momento del estudio social la doctora Mercado ya no estaba interviniendo con el menor.*

43. *La Dra. Frances Seda fue seleccionada como psicóloga del menor por recomendación de la Trabajadora Socia Litsky Collazo en el primer Informe Social.*

44. *El demandado, señor Rivera Labrador, es Fiscal Auxiliar y trabaja para el Departamento de Justicia.*

45. *El abuelo del menor también es Fiscal y trabaja para el Departamento de Justicia.*

**46.** *El 15 de julio de 2021, cuando la Trabajadora Social Litsky Collazo discutió el caso con la Dra. Frances Seda, ésta informó que estaba próxima a suscribir contratos de servicios profesionales con el Departamento de Justicia, lo que le generaba un conflicto para continuar tratando a Nicolás.*

**47.** *La Trabajadora Social Litsky Collazo desconocía que, previo a su intervención en este caso, la Dra. Frances Seda había tenido contratos previos con el Departamento de Justicia.*

**48.** *A solicitud de la parte demandante, tomamos conocimiento judicial de que la Dra. Frances Seda tuvo los siguientes contratos previos con el Departamento de Justicia:*
    *a. 2015-000047*
    *b. 2016-000057*
    *e. 2017-000062*

*49. Para los referidos años la señora Vallescorbo Cuevas también trabajaba para el Departamento de Justicia.*

**50.** *La Dra. Frances Seda intervino con Nicolás y con este núcleo familiar durante el periodo del 2020 al 2021.*

**51.** *No tenemos elementos para concluir que la Dra. Frances Seda tuviese conflictos de intereses al momento en que proveyó tratamiento a Nicolás o que su juicio profesional estuviese comprometido.*

**52.** *La señora Vallescorbo Cuevas no ha presentado una querella profesional por conflicto de intereses en contra de la Dra. Frances Seda.*

**53.** *De la entrevista de la Trabajadora Social Litsky Collazo a la Dra. Frances Seda se desprende que la que fue la psicóloga del menor opina lo siguiente con respecto a los asuntos en controversia en este caso:*
    *a. No ve impedimento o dificultad para que el menor se pueda relacionar con su abuelo y tío paterno.*
    *b. El menor se siente muy bien con su mamá y su papá.*
    *c. El señor Rivera Labrador sigue sus recomendaciones con respecto al menor.*
    *d. Ambas partes son excelentes padres y adoran a Nicolás.*

**54.** *La Dra. Frances Seda no recomienda que se retome la relación entre el menor y su abuela y tía paterna.*

**55.** *De la Evaluación Psicométrica del menor realizada por la Dra. Frances Seda el 10 de marzo de 2021, se desprende que la profesional hizo las siguientes recomendaciones, entre otras:*
    *a. Menor necesita terapia psicológica para manejo de emociones y desarrollo de autocontrol.*
    *b. Terapia educativa dirigida al desarrollo de destrezas de comprensión verbal y lectoescritura.*
    *c. Evaluaciones en las áreas de Terapia del Habla y Lenguaje.*

**56.** *Al presente, transcurridos casi dos años desde que se emitieran estas recomendaciones, las partes no han coordinado los servicios recomendados para el menor.*

**57.** *No nos persuade la explicación provista por la señora Vallescorbo Cuevas en términos de que no ha coordinado los servicios recomendados para el menor porque desconoce la dirección actual del señor Rivera Labrador y, por tanto, no sabe si los potenciales proveedores de estos servicios le quedan distantes.*

**58.** *En diciembre de 2017, Nicolás fue sometido a otra evaluación psicométrica, por parte del Dr. Alberto Pérez González, Psicólogo Clínico. Esa evaluación, copia de la cual fue admitida en evidencia, es anterior a que el menor ingresara al sistema educativo.*

**59.** *La evaluación del doctor Pérez González, a diferencia de la de la doctora Seda, no contiene recomendaciones de servicios específicos para el menor.*

*60.* Es razonable entender que la doctora Seda tenía elementos adicionales para emitir recomendaciones sobre servicios para el menor porque se trata de un niño que llevaba ya varios años en el escenario escolar, a diferencia de cuando fue evaluado por el doctor Pérez González.

*61.* Como parte de su Protocolo de Evaluación la Trabajadora Social Litsky Collazo no visitó el hogar del señor Rivera Labrador porque lo había visitado en ocasión del primer estudio social y, al momento de la segunda evaluación, el demandado vivía en la misma propiedad.

*62.* Durante las entrevistas realizadas por la Trabajadora Social Litsky Collazo la señora Vallescorbo Cuevas no levantó ningún planteamiento o alegación con respecto a la vivienda del señor Rivera Labrador que sugiriera a la Perito la necesidad de visitar nuevamente el hogar del demandado.

*63.* Como Fiscal, el señor Rivera Labrador realiza turnos.

*64.* Cuando el señor Rivera Labrador tiene turnos, el menor se queda con la señora Vallescorbo Cuevas, coordinación que se realiza por conducto del abuelo materno.

*65.* La Trabajadora Social Litsky Collazo no indagó en este estudio sobre las condiciones de salud del señor Rivera Labrador que provocan que sea paciente de Cannabis medicinal porque eso fue cubierto en el primer estudio social realizado.

*66.* Durante las entrevistas de la Trabajadora Social Litsky Collazo a la señora Vallescorbo Cuevas no hubo alegaciones o planteamientos relacionados con las condiciones de salud mental del demandado que sugirieran que era un asunto sobre el que se debía auscultar más allá de lo que ya surgía del primer estudio social.

*67.* La Trabajadora Social Litsky Collazo entrevistó a Nicolás en tres ocasiones. En todas las ocasiones el menor reiteró su deseo de estar tiempo igual con ambos progenitores.

*68.* Las entrevistas de la Trabajadora Social Litsky Collazo con el menor reflejan que Nicolás tiene fuertes vínculos y apego con ambos progenitores.

*69.* En el periodo evaluado Nicolás obtuvo promedio de A.

*70.* La Trabajadora Social Litsky Collazo no identifica impedimentos para que las partes continúen ejerciendo la Custodia Compartida de Nicolás.

*71.* Surge de los autos del caso que, en el 2019, la señora Vallescorbo Cuevas acudió al Tribunal en solicitud de remedios porque, según eventos que le había narrado Nicolás, ella entendía que el menor había sido agredido sexualmente por un primo paterno. En atención a las alegaciones presentadas, con la intervención de este Tribunal, se llevó a cabo un proceso de validación de abuso sexual, realizado por la Dra. Judith Mercado Colón, Psicóloga Clínica.

*72.* Del Informe sobre Evaluación Forense de la doctora Mercado Colón se desprenden los siguientes hallazgos y/o recomendaciones que son pertinentes a la controversia ante nuestra consideración:

   a. La profesional concluyó que el primo de Nicolás en efecto, "manifestó conductas sexualmente inapropiadas hacia él".

   b. La profesional concluyó que ello representaba una carga emocional para Nicolas y un conflicto con decir la verdad y mentir.

   c. La profesional concluyó que la abuela paterna de Nicolás, la Sra. Myrna I. Labrador Nazario, no dio credibilidad a las expresiones del niño sobre lo ocurrido.

   d. La profesional estableció que "es necesario que ambos padres le crean al menor para ayudarlo a superar esta experiencia".

e.    La profesional recomendó que "en el momento en que el Tribunal determine reanudar las relaciones del menor con la familia paterna, éstas deberán darse inicialmente dentro de un contexto de relaciones terapéuticas, para trabajar con la secuela emocional de la situación".

**73.** *La Perito de la parte demandante, Dra. Isis M. Rosales Concepción, tiene un contrato de 160 horas mensuales con la compañía privada Physician Correctional, que provee los servicios de salud a los confinados.*

**74.** *La doctora Rosales Concepción es, además, la directora del Help Me Center Skills and Learning Center, centro interdisciplinario en el que atiende a menores con dificultad de aprendizaje, desarrollo, conducta y emociones.*

**75.** *El testimonio de la doctora Rosales Concepción de que, además de su contrato de 160 horas mensuales con Physician Correctional, atiende entre 80 y 120 pacientes o casos[15] semanales en Help Me Center* no nos mereció credibilidad.

**76.** *Aunque la doctora Rosales Concepción declaró que ha sido perito en 5 a 7 casos de Custodia, no pudo identificar casos específicos en los que ha sido cualificada en tal calidad.*

**77.** *La doctora Rosales Concepción es cliente del abogado de la demandante, Lcdo. Dennis Seilhamer Andon, quien la representa legalmente en el caso número AG2020RF00267, del que tomamos conocimiento judicial a solicitud de la parte demandada.*

**78.** *Contrario a lo declarado por la doctora Rosales Concepción en términos de que se trataba de un caso que inició hacía unos cinco años, el referido caso inició en junio de 2020 y terminó hace menos de dos meses, mediante Sentencia de 31 de octubre de 2022. Es decir, que cuando la doctora Rosales fue contratada como Perito y cuando rindió su Informe el 23 de febrero de 2022, su caso personal estaba activo y el abogado de la demandante era también su abogado.*

**79.** *Para realizar su función como Perito Revisor, la doctora Rosales Concepción entrevistó en cuatro ocasiones a la demandante, señora Vallescorbo Cuevas, y en dos ocasiones a la pareja de la demandante, el señor Caballero Valentín. Además, realizó una vista ocular al hogar de la demandante.*

**80.** *La doctora Rosales Concepción no entrevistó al demandado, a ningún familiar de éste ni a otro colateral que no fuese la pareja de la demandante.*

**81.** *La doctora Rosales Concepción no entrevistó a Nicolás.*

**82.** *Según su Informe, el que fue admitido en evidencia, la doctora Rosales Concepción revisó varias mociones presentadas por las partes y una resolución del Tribunal. No obstante, al ser interrogada sobre la forma en la que tuvo acceso a dichos documentos, alegó que no los revisó, sino que su conocimiento sobre el contenido de estos provino del Informe de la Trabajadora Social Litsky Collazo. Las contradicciones de la Perito en este asunto minaron efectivamente su credibilidad.*

**83.** *El Informe Pericial de la doctora Rosales Concepción no detalla la literatura científica en la que sustenta su análisis, hallazgos y recomendaciones.*

**84.** *La doctora Rosales Concepción emite recomendaciones que incluyen mantener un acuerdo de comunicación entre dos partes que tienen un hijo en común de apenas 9 años.*

**85.** *Ocurrieron dos eventos que dieron lugar a que la señora Vallescorbo Cuevas solicitara una Orden de Protección Ex parte. Además, la señora Vallescorbo Cuevas se sentía humillada por el tono hostil de los mensajes del señor Rivera Labrador.*

---

[15] Inicialmente declaró que eran pacientes; luego indicó que son casos. [Nota de la *Sentencia*, *Véase*: Anejo CXX de la Apelante, pág. 448A.]

**86.** *El primer evento ocurrió durante el proceso de entrega y recogido del menor. Luego de que el menor se montara al carro del señor Rivera Labrador, <u>las partes</u> tuvieron una discusión relacionada con su participación sobre el inmueble que poseían en comunidad.*

**87.** *El otro evento ocurrió el 20 de mayo de 2020. Ese día al señor Rivera Labrador le correspondía recoger al menor en la casa del abuelo materno. La señora Vallescorbo Cuevas le solicitó recogiera al menor en la entrada de la Urbanización Monteclaro y el señor Rivera Labrador insistía en recogerlo dentro de la urbanización, en la casa del abuelo materno.*

**88.** *La seguridad de la urbanización le negó la entrada al señor Rivera Labrador y éste insistió en entrar en un momento en el que el portón de la urbanización permanecía parcialmente abierto, dejando su carro en frente al sistema de intercomunicación en el carril de visitantes, provocando con ello un tapón en la entrada de la urbanización.*

**89.** *Por este incidente la administración de la urbanización llamo a la Policía, quienes intervinieron con el señor Rivera Labrador.*

**90.** *Mientras ocurría este evento, la señora Vallescorbo estaba junto al señor Caballero Valentín y Nicolás, en su vehículo, en la entrada de la urbanización presenciando todo.*

**91.** *La señora Vallescorbo Cuevas y/o el señor Caballero Valentín optaron por bajarse del vehículo y tomar fotos del incidente.*

**92.** *La señora Vallescorbo Cuevas pudo haber optado por llevarse al menor del lugar para no exponerlo a ese evento mientras la situación pasaba.*

**93.** *Nicolás expresó a la señora Vallescorbo Cuevas que le da miedo cuando lo dejan solo.*

**94.** *El documento identificado como **Resumen de Documentos**, admitido como Exhibit 3, fue preparado por la señora Vallescorbo Cuevas, entregado a la Trabajadora Social Litsky Collazo y contiene el desglose de los otros documentos entregados a la Trabajadora Social con su versión respecto a la pertinencia de los mismos para el estudio social en curso.*

**95.** *La señora Vallescorbo Cuevas desconocía que el señor Rivera Labrador utilizara los servicios de una babysitter para cuidar a Nicolas hasta que leyó el Informe Social.*

**96.** *La Trabajadora Social Litsky Collazo no evaluó la distancia entre el hogar del señor Rivera Labrador y las del abuelo y tío paterno.*

**97.** *La señora Vallescorbo Cuevas entiende que el acuerdo logrado con el señor Rivera Labrador en ocasión de la solicitad de Orden de Protección presentada por ella es una medida que ha resultado muy beneficiosa para ella para retomar otros asuntos de su vida.*

**98.** *La señora Vallescorbo Cuevas le ha hecho preguntas al menor para indagar donde es la residencia actual del demandado.*

**99.** *La señora Vallescorbo es quien cuida al menor cuando el señor Rivera Labrador tiene turnos y cuando el menor no tiene clases, pero el demandado trabaja.*

**100.** *La señora Vallescorbo Cuevas ha optado por seleccionar alternativas de empleos que le den flexibilidad para atender al menor.*

**101.** *El abuelo materno sirve de intermediario para la coordinación y entrega del menor.*

**102.** *Desde mayo de 2020, no han ocurrido eventos adicionales durante la entrega y recogido del menor.*

**103.** *Desde su nacimiento, Nicolás ha estado bajo la custodia de ambos progenitores.*

**104.** *El Perito de la parte demandada, Dr. Larry Alicea Rodríguez fue cualificado como Perito sin objeción de la parte*

*demandante, luego de que las partes estipularan sus credenciales.*

**105.** *Es la opinión del doctor Alicea Rodríguez que el rol del perito revisor es contestar 23 preguntas de investigación, las que detalló y contestó en su Informe Pericial.*

**106.** *Es la impresión del doctor Alicea Rodríguez que la Trabajadora Social Litsky Collazo atendió de forma específica el asunto referido por el Tribunal en términos de si conviene al bienestar óptimo de Nicolás mantener la Custodia Compartida o cambiar a Custodia Monoparental y la respuesta fue recomendar mantener la Custodia Compartida.*

**107.** *Es la impresión del doctor Alicea Rodríguez que la Trabajadora Social Litsky Collazo sí recopiló datos que apoyan su recomendación y los corroboró (trianguló).*

**108.** *Es la impresión del doctor Alicea Rodríguez que la Trabajadora Social Litsky Collazo no levantó preocupaciones relacionadas a ética profesional.*

**109.** *Es la impresión del doctor Alicea Rodríguez que la Trabajadora Social Litsky Collazo evaluó datos suficientes para en el alcance y profundidad con relación a documentos revisados y colaterales.*

**110.** *Es la impresión del doctor Alicea Rodríguez que la Trabajadora Social Litsky Collazo no evidenció ningún sesgo confirmatorio.*

**111.** *Es la impresión del doctor Alicea Rodríguez que la Trabajadora Social Litsky Collazo utilizó modelos forenses apropiados o acercamientos conceptuales para acercarse a los asuntos objeto de estudio.*

**112.** *Es la impresión del doctor Alicea Rodríguez que la Trabajadora Social Litsky Collazo demuestra conocimiento suficiente y apropiado de las leyes y reglas que aplican al caso.*

**113.** *Es la impresión del doctor Alicea Rodríguez que la Trabajadora Social Litsky Collazo debió mejorar ciertos aspectos como la triangulación con la literatura y el establecimiento de hipótesis, pero que, a pesar de esas debilidades, el Informe Social atiende y contesta de forma adecuada la pregunta del Tribunal y fue realizado de forma competente. Es decir, son fallas, pero su gravedad no tiene el efecto de invalidar el Informe de la Trabajadora Social Litsky Collazo.*

**114.** *Es la impresión del doctor Alicea Rodríguez que la Trabajadora Social Litsky Collazo en su Informe corroboró las alegaciones de seguridad y descartó riesgo a la seguridad, luego de orientar al demandado; corroboró que el menor tiene apego a ambas partes; y, corroboró que no existe una amenaza fundamentada al bienestar del menor por parte del padre.*

**115.** *Con respecto a la intervención de la Perito de la parte demandante, doctora Rosales Concepción, el doctor Alicea Rodríguez señaló las siguientes irregularidades:*

   a. *La profesional realizó cuatro entrevistas con la demandante;*
   b. *La profesional hace referencia a documentos que fueron presentados por las partes con posterioridad a la fecha del Informe Pericial objeto de revisión.*
   c. *Tiene información selectiva y parcializada;*
   d. *Existe sesgo confirmatorio. La profesional escogió información que apoya su posición sin considerar otra;*
   e. *Carece de objetividad;*
   f. *No es balanceado;*
   g. *No contiene literatura sobre Custodia para establecer si la literatura apoya las conclusiones;*

h. *Sustenta sus conclusiones en la Teoría de Apego a pesar de que éticamente no se puede hacer una conclusión sobre Apego sin realizar una evaluación.*

i. *Un Perito Revisor puede levantar impresiones, más no conclusiones sin haber evaluado el caso.*

**116.** *Según la opinión profesional del doctor Alicea Rodríguez, el Informe de la doctora Rosales Concepción no refuta en cantidad ni en calidad el Informe de la Trabajadora Social Litsky Collazo.*

**117.** *Según la opinión profesional del doctor Alicea Rodríguez, el Informe de la doctora Rosales Concepción carece de utilidad, validez científica y no cumple con los criterios de un Informe de un Perito Revisor.*

**118.** *Según la opinión profesional del doctor Alicea Rodríguez, cuando existen problemas de comunicación entre los progenitores el menor resultará afectado, independientemente de la modalidad de Custodia, sea monoparental o compartida.*

**119.** *Según la opinión profesional del doctor Alicea Rodríguez, el Coordinador de Parentalidad es un recurso que sería de beneficio en este caso para que ayude a las partes a establecer parámetros en situaciones de alta conflictividad, a resolver oportunamente sus disputas y a implementar el plan de parentalidad que se establezca.*

**120.** *Según la opinión profesional del doctor Alicea Rodríguez, Nicolás debe ser visualizado como una persona que es sujeto de derecho y que tiene derecho a opinar.*

121. *El hecho de que la señora Vallescorbo Cuevas y el señor Rivera Labrador no hablen directamente no implica que no exista comunicación alguna entre ellos.*

**122.** *La Terapia de Coparentalidad se puede realizar de manera paralela, trabajando con las partes por separado.*

**123.** *Cuando la señora Vallescorbo Cuevas y el señor Rivera Labrador decidieron separarse, procuraron los servicios del Dr. Alberto Pérez González para ayudar al menor en el proceso, evitar que se sintiera abandonado y ayudarlos a ellos a establecer estructuras y métodos de disciplina uniformes para su hijo.*

**124.** *El señor Rivera Labrador entendía que era muy prematuro para exponer al menor a una tercera persona, el señor Caballero Valentín, y quiso abordar al doctor Pérez González al respecto, pero en privado, sin la presencia de la señora Vallescorbo Cuevas.*

**125.** *Ese acercamiento afectó la forma y la confianza en la que las partes habían venido trabajando con el doctor Pérez González y el profesional entendió que no podía continuar proveyéndoles el servicio.*

**126.** *La señora Vallescorbo Cuevas y el señor Rivera Labrador han estado inmersos en otra litigación por la división de la comunidad de bienes constituida entre ellos y han tenido múltiples controversias por el inmueble de Valparaíso.*

**127.** *El señor Rivera Labrador reconoce que no debió dejar solo al menor, por breve que le pareciera o por extraordinarias que fueran las circunstancia.*

**128.** *El señor Rivera Labrador debió optar por echar gasolina en otro momento o por encargar comida a domicilio, pero no debió dejar solo al menor en ningún momento, en ninguna circunstancia.*

**129.** *El señor Rivera Labrador no informó al Tribunal sobre su cambio de dirección. Es irrazonable su planteamiento de que su derecho a la intimidad le faculte a omitir brindar esa información, la que debe proveer ya que es parte en el caso y, además, por tratarse de la dirección de Nicolás cuando está bajo su custodia.*

**130.** *El señor Rivera Labrador no ha provisto regularmente la información sobre sus turnos como Fiscal. No nos persuade su*

*alegación de que proveer esa información le represente un problema de seguridad.*

*131. Las partes han cambiado de dirección, residiendo en Condado, Bayamón, Viejo San Juan, Cataño y Carolina, sin que ello haya interrumpido o afectado la Custodia Compartida de Nicolás.*

*132. El señor Rivera Labrador realiza turnos nocturnos por dos semanas, cada dos tres meses, con dos días libres cada semana.*

*133. El señor Caballero Valentín es la pareja sentimental de la señora Vallescorbo Cuevas.*

*134. Durante el evento ocurrido el 20 de mayo de 2020, en ningún momento el señor Rivera Labrador se acercó al vehículo del señor Caballero Valentín y de la señora Vallescorbo Cuevas ni tuvo comunicación con ellos.*

*135. El señor Caballero Valentín tiene cuenta de Twitter y en la misma ha escrito sobre el señor Rivera Labrador, imputando que el Fiscal tiene orden de protección, que la ha violado en múltiples ocasiones y que el Juez a cargo no hizo nada porque el demandado es hijo de otro Fiscal.*

*136. Ese tipo de publicación en las redes sociales por parte del señor Caballero Valentín resultan inflamatorios y agravan aún más la ya lacerada relación entre el señor Rivera Labrador y la señora Vallescorbo Cuevas, en menoscabo del bienestar óptimo de Nicolás.*

*137. Mediante Orden de 25 de mayo de 2021, designamos a la Dra. María del Mar Torres Suria como Coordinadora de Parentalidad en este caso, con la encomienda de ayudar a mejorar la comunicación entre las partes y promover que lograran acuerdos en búsqueda del mejor bienestar de Nicolás.*

*138. El 23 de agosto de 2022, la doctora Torres Suris rindió un Informe sobre su intervención en el caso.*

*139. Del referido Informe surge que la señora Vallescorbo Cuevas acudió a cita con la doctora Torres Suria en las siguientes fechas: 3 de agosto de 2021, 3 de septiembre de 2021, 8 de octubre de 2021, 3 de diciembre de 2021, 10 de enero de 2022 y 25 de febrero de 2022. El señor Rivera Labrador acudió a terapia con la doctora Torres Suria en las siguientes fechas: 13 de agosto de 2021, 3 de septiembre de 2021, 8 de octubre de 2021, 13 de diciembre de 2021 y 24 de febrero de 2022.*

*140. Surge del Informe que como parte de los esfuerzos de la doctora Torres Suria se intentó alcanzar un acuerdo con relación a la comunicación del menor con el progenitor no custodio en semanas alternas. A pesar de ser uno de los asuntos dentro del ámbito de acción de la Coordinadora de Parentalidad, las partes se resisten a implementar el acuerdo y quieren involucrar a sus respectivos representantes legales en todos los asuntos.*

*141. Del Informe de la doctora Torres Suria también se deprende que, por situaciones vividas, a la señora Vallescorbo Cuevas no le interesa tener comunicación directa con el señor Rivera Labrador por no confiar en él ni en su palabra.*

*142. Del Informe de la doctora Torres Suria surge que, aunque el señor Rivera Labrador manifiesta que su interés no es seguir litigando, los medios que emplea para resolver conflictos no son los más adecuados.*

*143. En su Informe la doctora Torres Suria indicó que en el presente caso no se cumplieron los objetivos del proceso de coparentalidad.[16]*

---

[16] *Id.*, en las págs. 443 – 453.

En la referida sentencia, el TPI concluyó: *"que la señora Vallescorbo Cuevas no logró impugnar efectivamente los hallazgos y las recomendaciones de la Trabajadora Social…".*[17] En lo pertinente, fundamentó:

- *Omisión de evaluar y considerar documentos producidos por la demandante* – *La señora Vallescorbo ha planteado reiteradamente que la Trabajadora Social omitió considerar los documentos que ella le produjo que son pertinentes a los criterios que establece la Ley 223 de 2011 y que evidencian que el demandado no ha ejercido su rol custodio de manera responsable. Sin embargo, del testimonio de la Trabajadora Social bajo juramento, <u>el que nos mereció credibilidad</u>, surge que ella sí consideró los documentos para su análisis, aunque no los haya desglosado, lo que debió hacer. Por otro lado, la parte demandante omitió someter los referidos documentos en evidencia, lo que nos impide conocer su contenido y evaluar si en efecto, los mismos pudieron haber afectado los hallazgos y recomendaciones del Informe Social.*

- *Carencia de Valor Probatorio del Informe Pericial de la parte demandante* – *Como surge de varias determinaciones de hechos, entendemos que la doctora Rosales Concepción entró en contradicciones sobre varios asuntos, lo que minó gravemente la credibilidad que nos mereció su testimonio. Para tratar de establecer que tiene experiencia en casos de Custodia de niños y que su experiencia no se limita o enfoca en casos de adultos transgresores, la doctora Rosales declaró que, además de tener un empleo a tiempo completo en el escenario correccional, atiende entre 80 y 120 casos semanales, lo que nos parece poco probable. Por otro lado, la Perito ofreció información incorrecta respecto su relación abogado-cliente con el representante legal de la parte demandante lo que, además de afectar su credibilidad, pone en entredicho su imparcialidad. De otra parte, la doctora Rosales Concepción trascendió su rol como perito revisor y se abrogó la facultad de realizar su propia evaluación, con el agravante de que, para ello, solamente consideró la posición de la parte demandante, lo que impide tener un análisis objetivo, balanceado e imparcial*
  *Sobre este asunto, nos persuade la opinión del doctor Alicea Rodríguez de que hubo sesgo confirmatorio y que el Informe de la doctora Rosales Concepción carece de validez.*

- *Seguridad del menor* - *La señora Vallescorbo Cuevas ha planteado, con toda razón, preocupaciones por la seguridad de su hijo ya que fue dejado solo en dos ocasiones por el padre y fue expuesto a situaciones de índole sexual por un primo paterno mientras estaba bajo el cuidado de la abuela paterna. Sobre ambos asuntos y su gravedad nos hemos expresado y tomado medidas. El señor Rivera Labrador conoce que no puede dejar al menor solo en ningún momento y ha sido receptivo a ello. Con respecto a la exposición a la conducta sexualizada, hemos determinado que el menor no puede relacionarse con la abuela y tía paterna y que corresponde a las partes siempre creerle a su hijo para que puedan ayudarlo.*

---

[17] *Id.*, en la pág. 457.

- *Violencia doméstica* - Aunque no nos corresponde adjudicar si hubo en este caso eventos que constituyeron violencia doméstica, si podemos concluir que hubo situaciones entre las partes que presenció el menor y que las partes debieron ejercer un mejor juicio para evitar exponer a Nicolás a esos eventos. Es claro para el Tribunal que las discusiones entre las partes no necesariamente han sido provocadas por asuntos relacionados con la Custodia de Nicolás, sino con otras situaciones entre ellos, como lo es la división del bien ganancial que tenían en común. En el incidente del 20 de mayo de 2020, el señor Rivera Labrador ejerció, cuanto menos, un pobre juicio y la señora Vallescorbo debió llevarse al menor del área para que no presenciara el incidente. Ambas partes faltaron en anteponer el bienestar del menor a sus conflictos.

- *Capacidades para satisfacer las necesidades del menor* – La parte demandante no logró convencernos de que el señor Rivera Labrador desatienta o esté incapacitado de suplir las necesidades médicas y educativas del menor y que sea ella la única que se encargue. Lo que surge de la prueba desfilada es que los problemas de comunicación les impiden a ambos atender y coordinar asertivamente las necesidades de salud y educativas del menor, lo que se evidencia en *el hecho de que, al día de hoy, no han implementado las recomendaciones provistas hace casi dos años por la Trabajadora Social, **lo que deben hacer de inmediato***.

- *Comunicación* – La falta de disposición a identificar canales de comunicación, aunque sean alternos, no puede ser avalada por el Tribunal y es un asunto que trasciende la modalidad de Custodia, que se establezca. Las partes en este caso tienen un hijo en común y es menester identificar formas de comunicarse lo que es indispensable y necesario para garantizar su bienestar al menos hasta que Nicolás tenga 21 años, cuando cese la Patria Potestad que ambos ejercen.[18]

Ante las determinaciones de hechos y conclusiones antes dicha, el TPI acogió las recomendaciones del Informe Social II, excepto las relacionadas al cuido nocturno por parte del abuelo y tío paterno. Por lo cual, dispuso:

*1. La Custodia del menor continuará siendo Compartida y ejercida por las partes de la siguiente forma:*
*- Semanas alternas: de lunes a lunes, entregando y recogiendo al menor en su colegio y cuando no haya clases en la caseta del guardia de la Urbanización Monteclaro, donde reside la madre y los abuelos maternos.*
*- Cuando el señor Rivera Labrador tenga turnos nocturnos la madre será la primera opción. Se le conceden 20 días al señor Rivera Labrador para informar la frecuencia con la que se le informan los turnos que se le asignan y para informar el próximo turno nocturno programado.*
*- Cada padre se comunicará con el menor miércoles y sábados entre 5:00 y 6:00 p.m. de la semana que no lo*

---

[18] *Id.*, en las págs. 457 – 459.

*tenga bajo su cuidado. De no responder la llamada, el padre que lo tiene bajo su cuidado se encargará de devolver la llamada.*

*2. Durante el período navideño se alternarán entre las partes las siguientes fechas cada año:*
*- Del 24 de diciembre a las 3:00 p.m. al 31 de diciembre a las 3:00 p.m.*
*- Del 31 de diciembre a las 3:00p.m. al 7 de enero a las 3:00 p.m.*
*- En el 2022-2023 el menor estará con la madre del 24 al 31 de diciembre y del 31 de diciembre al 7 de enero con el padre.*

*3. El fin de semana que se celebra el Día de los Padres, el menor permanecerá con el padre de viernes a domingo, independientemente a quien le corresponda. De igual forma será el fin de semana que se celebra el día de las Madres.*

*4. Se prohíbe a las partes, sus familiares y a cualquier otra persona relacionada a ellos hacer comentarios sobre las partes en presencia del menor.*

*5. Se prohíbe al Sr. Imanol Caballero, compañero de la madre, realizar comentarios alusivos al caso de las partes y sobre el Sr. Iván E. Rivera Labrador y sus familiares, en las redes sociales y en los medios de comunicación para los que escribe. De igual forma, el Sr. Iván E. Rivera Labrador no deberá hacer comentarios sobre el señor Caballero y sus familiares en las redes sociales.*

*6. Las partes se notificarán todos los asuntos relacionados al menor. Cada padre será responsable de las citas médicas, terapias y otros asuntos cuando lo tenga bajo su custodia.*

*7. Las partes continuarán participando del proceso de Coordinación de Parentalidad. Se les concede término de veinte (20) días para informar si existe conflicto para que ese servicio lo continúe proveyendo la Dra. María del Mar Torres Surja. Una vez designado el Coordinador de Parentalidad, el Tribunal emitirá Resolución definiendo el alcance específico de la intervención de dicho profesional.*

*8. El menor continuará participando de terapia psicológica. Se les concede a las partes término de veinte (20) días para informar el nombre del profesional que le dará tratamiento a Nicolás y la fecha de la siguiente cita.*

*9. Se les concede a las partes término de veinte (20) días para presentar moción conjunta informando la coordinación de todos los servicios recomendados por la Dra. Frances Seda.*

*10. Se le concede al señor Rivera Labrador término de diez (10) días para informar su dirección actual.*[19]

Inconforme, la señora Vallescorbo Cuevas el **13 de enero de 2023** presentó una *Moción en Solicitud de Reconsideración.*[20] Adujo, que la *Sentencia* dictada va en detrimento de la vida, la seguridad y la dignidad del menor. Señaló, que el foro primario no atendió los asuntos medulares, como exige la Ley Núm. 223–2011.[21]

---

[19] *Id.*, en la págs. 459 – 460.
[20] Anejo CXXI de la Apelante, págs. 461 – 487.
[21] Ley Núm. 223 de 21 de noviembre de 2011, según enmendada, conocida como *Ley Protectora de los Derechos de los Menores en el Proceso de Adjudicación de Custodia*, 32 LPRA sec. 3181 *et seq.*

En oposición, el apelado sometió su posición el **2 de febrero de 2023**.[22]

Atendida las mociones de las partes, el TPI declaró *No Ha Lugar* la solicitud de reconsideración el **3 de febrero de 2023**.[23]

Aún inconforme, el **8 de marzo de 2023** la señora Vallescorbo Cuevas recurrió ante este foro intermedio y señaló la comisión de cinco (5) errores:

> *Primero, erró y abusó de su discreción el honorable Tribunal de Primer Instancia al haber concluido que no se impugnó el Informe Social rendido por la Trabajadora Social Elizabeth Litsky, tras a haber descartado en lo absoluto la prueba pericial rendida por el perito de la parte Demandante lo que en la práctica tiene el efecto de una descalificación subsiliente. [sic].*
>
> *Segundo, erró y abusó de su discreción el honorable tribunal de Primera Instancia al haber concluido que no se impugnó el informe Social rendido por la Trabajadora Social Elizabeth Litsky, y acoger sus recomendaciones -sin ningún tipo de protección- a pesar de que estas no propenden al menor bienestar del menor ante hechos probados de maltrato por negligencia, según consta de las propias determinaciones de hecho del tribunal. [sic].*
>
> *Tercero, erró y abusó de su discreción el Honorable Tribunal de Primera Instancia al haber concluido que no se impugnó el Informe Social rendido por la Trabajadora Social Elizabeth Litsky al negarse a pasar juicio sobre los incidentes de violencia doméstica que además no fueron atendidos en el Informe y los cuales inciden al momento de otorgar una custodia al amparo de la Ley Núm. 223-2011. [sic].*
>
> *Cuarto, erró y abusó de su discreción el honorable Tribunal de Primera Instancia al haber concluido que no se impugnó el Informe Social rendido por la Trabajadora Social Elizabeth Litsky, al descartar la prueba presentada por la madre durante su testimonio y habida en el expediente del Tribunal, determinando que la única manera de probar el contenido de los documentos presentados a la Trabajadora Social y los cuales esta testificó haber recibido eran exclusivamente entrándolos como Exhibits de la parte Demandante, durante el proceso ante la Unidad Social. [sic].*
>
> *Quinto, erró y abusó de su discreción el Honorable Tribunal de Primera Instancia al emitir órdenes de censura previa en un proceso de custodia en contra terceros que son parte de la Demanda. [sic].*

Tras varias incidencias procesales, el señor Rivera Labrador sometió su oposición a la presente apelación el **10 de abril de 2023**. Sometida la Transcripción de la Prueba Oral (TPO) de la Vista de

---

[22] Anejo CXXII de la Apelante, págs. 488 – 490.
[23] Notificada el 6 de febrero de 2023.; Anejo CXXIII de la Apelante, págs. 491 – 491-A.

Impugnación de Informe Social, la apelante sometió el **10 de julio de 2023** un Escrito Suplementario. De igual forma, el **10 de noviembre de 2023** el apelado presentó el escrito intitulado: ESCRITO SUPLEMENTARIO REITERANDO OPOSICIÓN A APELACIÓN.

Habiendo comparecido las partes, damos por sometido el asunto.

**-II-**

Examinado el tracto procesal, pasemos ahora a exponer el derecho aplicable.

**-A-**

Al revisar una determinación de un tribunal de menor jerarquía, los tribunales tenemos la tarea principal de auscultar si se aplicó correctamente el derecho a los hechos particulares del caso.[24] Como regla general, los foros apelativos no debemos intervenir con las determinaciones de hechos de los tribunales de primera instancia, su apreciación sobre la credibilidad de los testigos y el valor probatorio conferido a la prueba presentada en sala, pues solo contamos con *"récords mudos e inexpresivos"*.[25] Lo anterior, se fundamenta en la premisa de que el foro primario es quien tiene la oportunidad de escuchar a los testigos declarar y apreciar su *"demeanor"*.[26]

Sin embargo, la norma de deferencia antes esbozada encuentra su excepción y cede cuando la parte promovente demuestra que:

> *[h]ubo un craso abuso de discreción o que el tribunal actuó con prejuicio y parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial.*[27]

---

[24] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013).
[25] *Id.*, págs. 770-771.; *SLG Rivera Carrasquillo v. AAA*, 177 DPR 345, 356 (2009).
[26] *Colón v. Lotería*, 167 DPR 625, 659 (2006).
[27] *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986).; *Trans-Oceanic Life Ins. v. Oracle Corp.*, 184 DPR 689, 709 (2012).

Por discreción se entiende el *"tener poder para decidir en una forma u otra, esto es, para escoger entre uno o varios cursos de acción".*[28] No obstante, *"el adecuado ejercicio de la discreción está inexorable e indefectiblemente atado al concepto de la razonabilidad".*[29] A esos efectos, el Tribunal Supremo de Puerto Rico ha enumerado situaciones que constituyen un abuso de discreción:

> *[c]uando el juez, en la decisión que emite, no toma en cuenta e ignora, sin fundamento para ello, un hecho material importante que no podía ser pasado por alto; cuando por el contrario el juez, sin justificación y fundamento alguno para ello, le concede gran peso y valor a un hecho irrelevante e inmaterial y basa su decisión exclusivamente en el mismo; o cuando, no obstante considerar y tomar en cuenta todos los hechos materiales e importantes y descartar los irrelevantes, el juez livianamente sopesa y calibra los mismos.*[30]

En cambio, si la actuación del tribunal no está desprovista de base razonable, ni perjudica los derechos sustanciales de una parte, debe prevalecer el criterio del juez de instancia a quien corresponde la dirección del proceso.[31] En ese sentido, las conclusiones de derecho son revisables en su totalidad por los tribunales apelativos.[32]

Ahora bien, la norma de deferencia antes esbozada no es de aplicación a la evaluación de la prueba pericial y documental. En lo que respecta a las conclusiones de hecho basadas en prueba pericial o documental, los foros revisores nos encontramos en igual posición que los tribunales sentenciadores para apreciarla y adoptar nuestro propio criterio.[33] Incluso, podemos descartarla, aunque sea técnicamente correcta.[34]

**-B-**

La jurisprudencia ha dispuesto que para tomar una determinación en que se *proteja el mejor interés del menor* debe

---

[28] *García v. Asociación,* 165 DPR 311, 321 (2005).
[29] *Id.*
[30] *Ramírez v. Policía de PR,* 158 DPR 320, 340-341 (2002).
[31] *SLG Zapata-Rivera v. JF Montalvo,* 189 DPR 414, 434-435 (2013).
[32] *Dávila Nieves v. Meléndez Marín, supra,* pág. 770.
[33] *González Hernández v. González Hernández,* 181 DPR 746, 777 (2011).
[34] *Id.*

considerarse una serie de factores que individualmente no son determinantes de por sí.

Algunos de los aspectos que deben tomarse en cuenta son: la preferencia del menor; su sexo, edad, salud mental y física; el cariño que puede brindársele por las partes en controversia; la habilidad de las partes para satisfacer debidamente las necesidades afectivas, morales y económicas del menor; el grado de ajuste del menor al hogar, la escuela y la comunidad en que vive; la interrelación del menor con las partes, sus hermanos y otros miembros de la familia; y la salud psíquica de todas las partes.[35]

La Ley Núm. 223-2011[36] establece como política pública del Estado que los tribunales, aun contra la voluntad de alguno de los progenitores que interese se le otorgue la custodia monoparental, evalúen y consideren la custodia compartida como primera opción.[37] En ese sentido, el Artículo 7 del estatuto dispone que al considerarse una solicitud de custodia en la que surjan controversias entre los progenitores, el tribunal referirá el caso al trabajador social de Relaciones de Familia, para que realice una evaluación y rinda un informe con recomendaciones al Tribunal.[38] Tanto el trabajador social, como el tribunal, tomarán en consideración los siguientes criterios:

1) *La salud mental de ambos progenitores, así como la del hijo(a) o hijos(as) cuya custodia se va a adjudicar.*
2) *El nivel de responsabilidad o integridad moral exhibido por cada uno de los progenitores y si ha habido un historial de violencia doméstica entre los integrantes del núcleo familiar.*
3) *La capacidad de cada progenitor para satisfacer las necesidades afectivas, económicas y morales del menor, tanto presentes como futuras.*
4) *El historial de cada progenitor en la relación con sus hijos, tanto antes del divorcio, separación o disolución de la relación consensual, como después del mismo.*

---

[35] *Marrero Reyes v. García Ramírez*, 105 DPR 90, 105 (1976).
[36] Ley Núm. 223 de 21 de noviembre de 2011, según enmendada, conocida como *Ley Protectora de los Derechos de los Menores en el Proceso de Adjudicación de Custodia*, 32 LPRA sec. 3181 *et seq.*
[37] Arts. 2 y 4 de la Ley Núm. 223-2011, *supra*. 32 LPRA secs. 3181 y 3182.
[38] 32 LPRA sec. 3185.

5) *Las necesidades específicas de cada uno de los menores cuya custodia está en controversia.*

6) *La interrelación de cada menor, con sus progenitores, sus hermanos y demás miembros de la familia.*

7) *Que la decisión no sea producto de la irreflexión o coacción.*

8) *Si los progenitores poseen la capacidad, disponibilidad y firme propósito de asumir la responsabilidad de criar los hijos conjuntamente.*

9) *Los verdaderos motivos y objetivos por los cuales los progenitores han solicitado la patria potestad y custodia compartida.*

10) *Si la profesión, ocupación u oficio que realizan los progenitores impedirá que funcione el acuerdo efectivamente.*

11) *Si la ubicación y distancia de ambos hogares perjudica la educación del menor.*

12) *La comunicación que existe entre los progenitores y la capacidad para comunicarse mediante comunicación directa o utilizando mecanismos alternos.*

13) *Analizará la presencia de la enajenación parental, o cualesquiera otras razones que pudieran ocasionar la resistencia del menor para relacionarse con sus padres.*
    *[. . .].*

14) *Cualquier otro criterio válido o pertinente que pueda considerarse para garantizar el mejor bienestar del menor.*[39]

Por su parte, el Artículo 9 de la Ley Núm. 223-2011, *supra*, señala las instancias en que la custodia compartida no debe ser considerada como beneficiosa y favorable para los mejores intereses de los menores.[40] A saber:

1) *Cuando uno de los progenitores manifiesta que no le interesa tener la custodia de los menores, a base de un plan de custodia compartida. Se entenderá que la renuncia es a favor del otro progenitor.*

2) *Si uno de los progenitores sufre de una incapacidad o deficiencia mental, según determinada por un profesional de la salud, y la misma es de naturaleza irreversible y de tal magnitud que le impide atender adecuadamente a los hijos/as y garantizar la seguridad e integridad física, mental, emocional y/o sexual de éstos.*

3) *Cuando los actos u omisiones de uno de los progenitores resulte perjudicial a los hijos o constituya un patrón de ejemplos corruptores.*

4) *Cuando uno de los progenitores o su cónyuge o compañero o compañera consensual haya sido convicto por actos constitutivos de maltrato de menores.*

5) *Cuando uno de los progenitores se encuentre confinado en una institución carcelaria.*

6) *Cuando uno de los progenitores ha sido convicto por actos constitutivos de violencia doméstica, según lo*

---

[39] *Id.*
[40] 32 LPRA sec. 3187.

*dispuesto en la Ley Núm. 54 de 15 de agosto de 1989, según enmendada.*

7) *Situaciones donde el padre o la madre haya cometido abuso sexual, o cualquiera de los delitos sexuales, según tipificados en el Código Penal de Puerto Rico, hacia algún menor.*

8) *Cuando uno de los progenitores o su cónyuge o compañero o compañero consensual, si hubiera, sea adicto a drogas ilegales o alcohol.*[41]

Por último, cabe señalar que, *"[e]l Tribunal siempre tendrá discreción judicial para la determinación y adjudicación de custodia, protegiendo siempre los mejores intereses y el bienestar de los menores a la luz de todas las circunstancias existentes"*.[42]

**-III-**

En el presente caso la apelante arguye que el TPI incidió al concluir que no se impugnó el Informe Social II rendido por la TS Litsky Collazo, lo cual desembocó en la formulación de determinaciones de hechos erróneas y, en consecuencia, en un dictamen desfavorecedor.

Particularmente, la apelante nos señala que el TPI erró al acoger las recomendaciones de la TS Litsky Collazo sin considerar los hechos de maltrato probados; omitir las alegaciones de violencia doméstica; además, le concedió poco o ningún valor probatorio a la prueba documental y pericial vertida por la parte apelante. También, aduce que incidió al censurar previamente a una persona que no es parte en el pleito, y sobre el cual, el aludido foro no adquirió jurisdicción. No tiene razón. Veamos.

Primeramente, debemos señalar que el TPI no descartó la prueba pericial rendida por la Dra. Rosales Concepción, perito de la parte demandante-apelante. Por el contrario, el juzgador evaluó y adjudicó el valor probatorio correspondiente a la prueba presentada:

> *[A] la doctora Isis Rosales, como perito en este caso, el Tribunal la va a declarar Con Lugar. Cualquier asunto relacionado al valor probatorio que se le provea al testimonio de la doctora, pues, ya será materia de adjudicación en el momento de... de eso mismo, de determinar valor probatorio.*[43]

---

[41] *Id.*
[42] 32 LPRA sec. 3186.
[43] TPO del 6 de diciembre de 2022, pág. 44.

Algo muy diferente a descartar la prueba, es determinar que la misma carecía de valor probatorio. Ciertamente, el TPI determinó que el testimonio de la Dra. Rosales Concepción, al igual que su informe, carecían de valor probatorio y fundamentó sus razones. Ello lo hizo al escuchar el testimonio, examinar el informe y observar el *demeanor* de la perito. Nada en el expediente nos mueve a tomar una determinación en contrario, por lo cual merece nuestra deferencia.

En segundo orden —y en cuanto a la falta de protección del TPI ante los alegados hechos de maltrato por negligencia—, tampoco tiene razón. Contrario a lo argumentado por la apelante, debemos indicar que el foro primario dispuso medidas para asegurar el mejor bienestar del menor. Surge del expediente, que hubo unos incidentes donde NERV fue dejado solo mientras se encontraba bajo la responsabilidad del señor Rivera Labrador, sin embargo, en su momento y reiterado en varias ocasiones, éste fue advertido de que no podía dejar solo al menor. En cuanto a la situación donde el menor fue expuesto a una conducta sexualizada, el juzgador estableció las restricciones que entendió correctas, y aún en la sentencia apelada reiteró ciertas prohibiciones en relación a dicho asunto.

En tercer orden —y relación a la negativa del TPI a pasar juicio sobre los incidentes de violencia doméstica—, no tiene razón. El Artículo 9 de la Ley Núm. 223-2011 dispone que no se considerará una solicitud de custodia compartida cuando uno de los progenitores haya sido **convicto** por un caso de Ley Núm. 54–1989, no obstante, en el presente caso no surge que los progenitores hayan sido convictos por Ley Núm. 54–1989.[44] Ciertamente, los

---

[44] De los autos ante nos, surge que el 23 de mayo de 2020 mediante el caso *OPA-2020-003545* se expidió una *Orden de Protección Ex Parte* a favor de la señora Vallescorbo Cuevas. Sin embargo, dicha orden fue archivada ante el desistimiento de la parte peticionaria (señora Vallescorbo Cuevas). *Véase*: Anejos XL & XLV de la Apelante, págs. 139 – 148, 171 – 173.

progenitores han tenido controversias abrasivas y totalmente reprochables, pero el juzgador apreció que no constituyen un impedimento para que los padres compartieran la custodia del menor NERV.

En cuarto lugar —y concerniente a los documentos que la apelante le entregó a la TS Litsky Collazo y no los incluyó en el informe—, no tiene razón. La apelante no colocó al TPI en posición de poder evaluar la información que contenía los mismos:

> [S]in embargo, del testimonio de la Trabajadora Social bajo juramento, el que nos mereció credibilidad, surge que ella sí consideró los documentos para su análisis, aunque no los haya desglosado, lo que debió hacer. Por otro lado, la parte demandante **omitió someter los referidos documentos en evidencia, lo que nos impide conocer su contenido y evaluar** si en efecto, los mismos pudieron haber afectado los hallazgos y recomendaciones del Informe Social.

Ciertamente, para que el juzgador tuviera la oportunidad de examinar el contenido de cada documento, la apelante no cumplió con las condiciones básicas que establecen las Reglas de Evidencia de Puerto Rico. Luego de examinar la TPO,[45] sin lugar a duda, fue la propia apelante quien no puso al TPI en la posición de evaluar dichos documentos.

Por último, —en cuanto al planteamiento de censura previa al señor Imanol Caballero Valentín—, indicamos que la orden del TPI está dirigida a velar por el mejor bienestar del menor. Nótese, que la orden expresamente dispuso:

> "*Se prohíbe al Sr. Imanol Caballero, compañero de la madre, realizar comentarios alusivos **al caso de las partes y sobre el Sr. Iván E. Rivera Labrador y sus familiares**, en las redes sociales y en los medios de comunicación para los que escribe*".[46]

Es decir, lo que se busca prohibir son los comentarios alusivos a este caso y los conflictos habidos entre las partes y sus familiares.

Visto lo anterior, concluimos que contrario a lo argüido por la parte apelante, las determinaciones de hechos del TPI sí hallan

---

[45] *Véase,* TPO del 7 de diciembre de 2022, págs. 40 – 81.
[46] *Véase,* la Sentencia apelada, a la pág. 460 del apéndice.

fundamento en la prueba desfilada, tanto testifical como documental. Por lo que, en la ausencia de prejuicio, parcialidad o error manifiesto del juzgador de los hechos en la apreciación de la prueba, confirmamos la Sentencia apelada.

**-IV-**

Por los fundamentos antes expuestos, se **confirma** la Sentencia apelada.

Lo acordó el Tribunal y lo certifica la secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones